# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued April 12, 2023          Decided July 21, 2023

No. 22-1090

CITADEL FNGE LTD.,
PETITIONER

v.

FEDERAL ENERGY REGULATORY COMMISSION,
RESPONDENT

MONITORING ANALYTICS, LLC AND PJM INTERCONNECTION,
L.L.C.,
INTERVENORS

———

Consolidated with 22-1106

———

On Petitions for Review of Orders of the
Federal Energy Regulatory Commission

———

*Brian P. Morrissey* argued the cause for petitioner. With him on the briefs were *Carter G. Phillips*, *Kenneth W. Irvin*, and *Peter A. Bruland*.

*Matthew J. Glover*, Attorney, Federal Energy Regulatory Commission, argued the cause for respondent. With him on

the brief were *Matthew R. Christiansen*, General Counsel, and *Robert H. Solomon*, Solicitor. *Susanna Y. Chu*, Attorney, entered an appearance.

*Paul M. Flynn* argued the cause for intervenors in support of respondent. With him on the brief were *Jeffrey W. Mayes*, *Ryan J. Collins,* and *Elizabeth P. Trinkle*.

Before: SRINIVASAN, *Chief Judge*, MILLETT, and WALKER, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* MILLETT.

Dissenting opinion filed by *Circuit Judge* WALKER.

MILLETT, *Circuit Judge*: This case concerns how PJM, the manager of a large, multi-state electrical grid, prices the flow of electricity to utilities in times of congestion. Such congestion arises when energy is scarce in a particular location on the grid due to, for example, extreme weather conditions or a fire at a transmission station. That scarcity causes the dispatch of more expensive generation and can trigger the Transmission Constraint Penalty Factor ("Penalty Factor") when such alternative generation is unavailable. The Penalty Factor imposes an upper bound on the costs PJM will incur to control a transmission constraint, and it is designed to send transparent price signals to the market and incentivize investment that will resolve the congestion and prevent it from recurring.

In early 2022, PJM temporarily removed one of three electric transmission lines that served consumers in Virginia's Northern Neck peninsula as part of planned upgrades. Because the Northern Neck lacked additional generation sources to make up for the outage, the other two transmission

lines serving the Northern Neck experienced congestion that PJM could not resolve with low-cost generation. As a result, the Penalty Factor frequently set the congestion cost in the Northern Neck.

After PJM filed a complaint with the Federal Energy Regulatory Commission, the Commission found that application of the Penalty Factor to the Northern Neck during the transmission-line outage was unjust and unreasonable under the Federal Power Act and temporarily suspended its application at the Northern Neck for the duration of the transmission line's outage. 16 U.S.C. § 791a *et seq.*

Petitioner Citadel FNGE Ltd. is an energy trading firm. It challenges the Commission's suspension of the Penalty Factor as arbitrary and capricious.

We deny the petitions for review. Substantial evidence supported the Commission's decision that the Penalty Factor, as applied to the unique Northern Neck circumstances, could not work as designed because it increased costs without incentivizing supply or demand responses. Because application of the Penalty Factor increased costs for consumers without a commensurate benefit, the Commission reasonably found that its application in this context was unjust and unreasonable.

**I**

**A**

The Federal Power Act grants the Commission the authority to regulate "the transmission of electric energy * * * and the sale of such energy at wholesale in interstate commerce[.]" 16 U.S.C. § 824(a). Under Section 206 of the

Act, the Commission must ensure that any rates charged for energy are "just and reasonable[.]" *Id.* § 824e(a); *see also id.* § 824d(a). One way the Commission can enforce that requirement is by initiating enforcement proceedings on its own or in response to a third-party complaint. *Id.* § 824e(a). If the Commission finds that a rate is "unjust, unreasonable, unduly discriminatory or preferential," the Commission must overturn that rate and impose a new just and reasonable rate. *Id.*

**B**

**1**

In many parts of the United States, the electrical generation and transmission system is managed by Regional Transmission Organizations. Regional Transmission Organizations serve several functions, including operating the electrical grid in a defined geographic area, balancing energy supply and demand, establishing markets for the sale and purchase of electricity, and ensuring the reliable transmission of electricity. *See Public Citizen, Inc. v. FERC*, 7 F.4th 1177, 1186 (D.C. Cir. 2021) (citing FERC, ENERGY PRIMER: A HANDBOOK FOR ENERGY MARKET BASICS, at 61 (April 2020), https://perma.cc/7UN6-6TR8 ("ENERGY PRIMER")).

PJM Interconnection, L.L.C. ("PJM") is the Regional Transmission Organization that oversees the electric grid covering thirteen Mid-Atlantic and Midwestern States and the District of Columbia. Power generators—such as natural-gas fired or nuclear power plants and renewable energy resources—produce electricity. *Advanced Energy Mgmt. All. v. FERC*, 860 F.3d 656, 659 (D.C. Cir. 2017). Power generators sell electricity at wholesale rates to utilities that then deliver the electricity to consumers. *Id.* PJM coordinates the

dispatch of generation and demand resources by operating markets for the supply and purchase of energy. *Id.* The markets reflect the availability and need for electricity and set price signals that indicate to market participants the value of the electricity. *FERC v. Electric Power Supply Ass'n*, 577 U.S. 260, 268 (2016).

PJM operates two energy markets. The first is the day-ahead market, which allows market participants to bid on selling or purchasing electricity that will be dispatched the next day. *See* ENERGY PRIMER, at 87. The day-ahead market produces the schedule and financial terms of energy production for the day. But various risk factors may alter the actual supply of and demand for electricity—for example, a sudden outage at a power plant. *Black Oak Energy, LLC v. FERC*, 725 F.3d 230, 233 (D.C. Cir. 2013). To adjust for such changes, PJM operates a second market, known as the real-time market. That market is used to meet immediate demand for electricity by trading electricity at prices quoted for sale and delivery within five-minute intervals based on the then-current grid operating conditions. *Id.*; *see* ENERGY PRIMER, at 87–88.

**2**

PJM outlines its market rules, rates, and operating procedures in a document called the Open Access Transmission Tariff. Most relevant here, that tariff contains rules that establish the wholesale price of electricity. PJM calculates the wholesale price using a method called locational marginal pricing. *See Black Oak Energy, LLC*, 725 F.3d at 233–234. Under this method, prices are designed to reflect the lowest cost of meeting an incremental megawatt-hour of demand at each location on the grid. *Id.* Prices vary based on time and location. *Id.* The local marginal price is the bottom-line wholesale price at a particular place, which may be

the price at which wholesale transactions actually settle or otherwise a component of an average price used for settlement. *Id.* at 234; *see also* ENERGY PRIMER, at 65; Letter from Chenchao Lu, Assistant Counsel & Craig Glazer, Vice President—Federal Government Policy, PJM Interconnection, L.L.C., to the Hon. Kimberly D. Bose, Secretary, Fed. Energy Regulatory Comm'n, at 4 (Feb. 15, 2022) (J.A. 283); Citadel Opening Br. 14. The local marginal price has three components: (1) the cost of generation; (2) the cost of transmission losses when electricity flows across the transmission system; and (3) the cost of congestion. *Black Oak Energy, LLC*, 725 F.3d at 233–234. Congestion costs are at issue in this case.

Congestion arises when energy becomes scarce in a defined location. *International Transmission Co. v. FERC*, 988 F.3d 471, 473 (D.C. Cir. 2021). Congestion can be caused by transmission constraints—such as line outages or weather events—meaning that the power lines needed to deliver the cheapest energy to a particular destination are at capacity or otherwise unavailable.

When congestion occurs, the lowest-priced electricity cannot reach areas of high demand because there is some barrier to transporting that cheaper power to consumers. *International Transmission*, 988 F.3d at 473. In those circumstances, PJM is forced to dispatch more expensive generation that can follow a less congested path. *Id.*; *see also* PJM INTERCONNECTION, L.L.C., FTRS: PROTECTION AGAINST CONGESTION CHARGES, at 1 (June 18, 2020), https://perma.cc/9BDQ-PVFL ("FTR FACT SHEET") ("[C]ongestion is addressed by dispatching higher-priced

electricity that can follow a less congested path in the transmission system[.]").

The entity providing electricity to consumers, often a utility or electric company, bears the initial cost of congestion. When electricity travels between the source of its generation and its delivery point, the utility must pay the difference between the local marginal price at those two destinations.  If there is no congestion, the local marginal price at each location should be the same.  However, when a particular part of the grid is congested (when PJM must call on more expensive electricity to meet demand), the congestion cost in the constrained area will be higher.  Because congestion costs serve as one of the three components used to calculate the local marginal price, an increase in congestion costs in one area will commonly raise the local marginal price of electricity in that area.

**3**

PJM's market rules set an upper limit on the price of electricity during times of congestion.  To do that, PJM coordinates the dispatch of energy using an algorithm.  When congestion arises, the algorithm uses the Penalty Factor to ensure electricity arrives where it is needed.  The Penalty Factor represents the maximum cost that PJM will incur to resolve the problem causing congestion.

Here is how it works:  The algorithm determines the least expensive means of delivering electricity to different locations across the grid based on system conditions, including transmission constraints.  When congestion is present at a point, the algorithm exhausts all available options to relieve the constraint up to the cost of the Penalty Factor.  If available generation cannot fix the problem, the marginal value for

transmitting electricity around the congestion point will be capped at the Penalty Factor's amount.

In that way, congestion on the electrical grid is like a traffic jam that makes it difficult for PJM to move electricity where it needs to go. Yet PJM must still deliver the electricity. To do so, PJM routes electricity across transmission lines that are less jammed. PJM will search for alternative resources to provide electricity and will spend up to the price of the Penalty Factor on those resources. If an alternative resource can resolve the congestion at a price that is lower than the Penalty Factor, that alternative resource will set the price. But if PJM cannot find an alternative resource to resolve the congestion, the Penalty Factor sets the price. That price then factors into computation of the congestion cost. And that congestion cost then gets factored into the local marginal price of the electricity received.

Prior to 2019, PJM did not use the Penalty Factor to set the marginal value of electricity. That changed when the Commission issued a rule in 2018 requiring Regional Transmission Organizations, like PJM, to include Penalty Factors in their tariffs and to specify when the Penalty Factor could set the local marginal price. 18 C.F.R. § 35.28(g)(10)(iii) (2022); *Uplift Cost Allocation & Transparency in Markets Operated by Reg'l Transmission Orgs. & Indep. Sys. Operators*, 163 FERC ¶ 61041, at 85–86 (April 19, 2018) ("Order 844"). The Commission did so because Penalty Factors provide greater predictability and transparency to market participants about how PJM's actions and practices in periods of congestion affect prices. Without transparency, the Commission reasoned, participants cannot understand the impact of the Penalty Factor on wholesale rates

or create solutions to improve the market's efficient operation. *See* Order 844, 163 FERC ¶ 61041, at 85.

PJM accordingly filed a tariff that adopted and explained the operation of its Penalty Factor. PJM advised that it would allow the Penalty Factor to cap the marginal value of resolving a constraint. For the real-time energy market at issue here, PJM set the Penalty Factor at $2,000/MWh. In practice, this means that if a constraint arises, PJM will attempt to resolve it by dispatching higher cost electricity. PJM first will exhaust all possible remedies that cost less than $2,000/MWh. If PJM finds a remedy that costs less than $2,000/MWh, the cost of that remedy will set the congestion price. If PJM cannot resolve the congestion constraint below $2,000/MWh, the congestion price will be locked in at $2,000/MWh.

The Commission adopted PJM's proposed tariff. It became effective on February 1, 2019. *PJM Interconnection, L.L.C.*, 166 FERC ¶ 61015 (Jan. 8, 2019).

**4**

As noted above, utilities are responsible for paying congestion costs—the difference between the local marginal price where the electricity goes into the grid and where it is received by the utility. When congestion occurs, utilities must pay more to receive electricity than the generators got paid to produce the electricity.

Financial Transmission Rights are a type of investment that can help protect market participants against high congestion costs. Financial Transmission Rights are "financial instruments that entitle their holders to be paid the congestion costs associated with transmitting a given quantity of electricity between two specified points." *Wisconsin Pub.*

*Power, Inc. v. FERC*, 493 F.3d 239, 251 (D.C. Cir. 2007). In doing so, Financial Transmission Rights let market participants hedge or offset their potential losses due to congestion. *See id*. At the time of transmission, the party will pay PJM the applicable congestion costs, but then will redeem its transmission right to receive the same amount back from PJM.

Market participants that do not transmit electricity, such as energy traders like Citadel, can also acquire Financial Transmission Rights. These traders effectively place a bet on congestion charges between two points on the grid. Financial Transmission Rights are beneficial for these parties because, for each hour congestion exists between the source and place of receipt, the holder of the right receives a share of the congestion cost collected from the utility. 6 PJM MANUAL: FINANCIAL TRANSMISSION RIGHTS, at 10 (Feb. 23, 2023), https://perma.cc/GV48-6XUE; FERC Br. 14. When the price is higher at the recipient's end than at the source, the Financial Transmission Right is an asset to its holder. FTR FACT SHEET, at 2. But when the price of electricity is lower at the recipient's end than at the source, a Financial Transmission Right is a liability to its holder. *Id.*

## II

### A

This dispute involves the impact of congestion in the Northern Neck peninsula in Virginia and the Penalty Factor's response to such congestion. The Northern Neck peninsula is served by three transmission lines: (1) the Lanexa Line, (2) the Fredericksburg Line, and (3) the Harmony Village Line.

In January 2022, PJM took the Lanexa Line out of service to conduct planned upgrades. PJM estimated that the Lanexa

Line would be out of service for two years, until December 2023.

The Lanexa Line outage quickly caused congestion along the two remaining lines. As a result, in the early months of 2022, the Penalty Factor frequently set congestion costs for the Northern Neck.

In response, PJM asked the Commission to suspend the application of the Penalty Factor at the Northern Neck for the duration of the Lanexa Line outage because it caused unjust and unreasonable rates for consumers in violation of Section 206 of the Federal Power Act.

PJM noted that the Penalty Factor is intended to send price signals that alert market participants to the existence of a transmission constraint and indicate where transmission and generation investments are needed. Those signals, in turn, are meant to incentivize investments to alleviate the constraint and to develop long-term solutions.

PJM argued that, because of the unique and temporary circumstances causing congestion at the Northern Neck, the Penalty Factor was not serving its purpose. And the Penalty Factor's increased costs had not and likely would not incentivize responses to mitigate the congestion for four reasons.

First, there were only two other transmission lines available to bring electricity into the Northern Neck while the Lanexa Line was being upgraded. There also was only one set of combustion turbine units available that could attempt to make up for some of the lost energy transmitted by these lines.

So the Northern Neck's ability to respond to the congestion was quite limited.

Second, that lack of available resources caused the local marginal price to fluctuate drastically in times of congestion. For example, even when the turbine units were fully operating in the early morning hours, they were insufficient to prevent congestion, so the Penalty Factor kicked in. But as the sun came out, local solar production in the Northern Neck combined with those local turbine units mitigated congestion, which often kept the congestion cost below the Penalty Factor cap. As a result, the Penalty Factor was incapable of sending consistent or reliable signals about whether an investment response to the congestion was needed.

Third, the Penalty Factor's function is to incentivize investment or increased production, but neither would occur in the unique situation at hand. Material short-term investments would not occur, PJM explained, because new resources would not come online until after the Lanexa Line upgrade was completed. At that point, the demand for the newly placed resource would evaporate. Also, without any long-term payoff, investors would be unlikely to fund a new resource because alleviating the constraint would eliminate the need to apply the Penalty Factor in the short term, which in turn would reduce their revenue.

Long-term solutions were even more unlikely, in PJM's view. Congestion happened because of the Lanexa Line upgrade. And there was no evidence that additional long-term investments were needed beyond what the updated Lanexa Line would provide. In other words, it is long-term

investment that temporarily caused—but would ultimately resolve—the congestion problem.

Fourth, demand for electricity in the Northern Neck was inelastic, and so the congestion problem could not be materially redressed by reducing demand.

Citadel opposed PJM's proposal. Citadel argued that PJM failed to prove a link between the application of the Penalty Factor and rates paid by consumers. Even if consumers paid higher rates, Citadel argued, PJM failed to show why the higher rates are unjust and unreasonable. Citadel also asserted that PJM did not demonstrate that the market was incapable of responding to the price signals being sent by the Penalty Factor, and that the Commission's decision injects regulatory uncertainty into the market.

In response, PJM advised that it was considering upgrades to two parts of the Harmony Village line—the Harmony Village-Greys Point segment ("Greys Point segment") and the Rappahannock-White Stone segment ("White Stone segment"). Dominion Energy Services, Inc., the utility whose transmission lines serve the Northern Neck, proposed accelerating that timeframe so that the upgrades would be in service by the end of May 2022. PJM predicted that, if approved, the project would "significantly alleviate" the constraint causing congestion and would limit the potential for anomalous prices. PJM's Answer to Citadel's Protest, at 11 (J.A. 254).

PJM cautioned, though, that the start date was speculative and that, even if completed by May, there was a material risk that the upgrades would not prevent anomalous prices during periods of high demand in the summer and winter. For that reason, PJM proposed that the Penalty Factor remain

suspended so that, if the Dominion upgrades went forward, the two measures could work in tandem to control prices and congestion during the balance of the Lanexa Line upgrade.

**B**

**1**

In mid-February 2022, the Commission ordered suspension of the Penalty Factor at the Northern Neck during the remainder of the Lanexa Line's outage. The Commission agreed with PJM that the Penalty Factor was creating abnormal price signals that were neither warranted nor actionable. New generation sufficient to relieve the congestion was not reasonably expected to go online before the outage would be resolved. And long-term investments would be redundant of the ongoing Lanexa Line upgrade. In addition, there had been no material reduction in the need for power, and the record lacked any indication that a demand response sufficient to control the constraint was on the horizon. Because of the unique and temporary circumstances causing the congestion and the unavailability of market responses, the Commission explained, the Penalty Factor would result in higher prices without any commensurate benefit of helping to meet consumer demand, which would be antithetical to the Penalty Factor's purpose.

The Commission further found that PJM's replacement rate was just and reasonable because it was limited in time and scope. That replacement rate allowed the price, in times of congestion, to be set by the price of the resources employed in the effort to resolve the congestion.

The Commission rejected Citadel's contention that short-term investments were forthcoming that would obviate the

need for the Penalty Factor. The Commission found that Citadel's projections were speculative because it was unclear whether the project it identified would actually be constructed and put in service in time to redress the congestion issue.

The Commission also rejected Citadel's argument that PJM had failed to show a link between the application of the Penalty Factor and high prices, pointing to two charts provided by PJM showing that congestion prices continued to oscillate between $2000/MWh (when the Penalty Factor made up part of the congestion price) and near $0/MWh (when lower priced energy was available). The charts also showed that a rise in the congestion price directly impacts the rates paid by consumers because the congestion price is one of three components of the local marginal price.

Citadel also argued that the congestion caused by the Lanexa Line outage was not unforeseen, unusual, or unique, as outages had also occurred in 2020 and 2021. The Commission responded that this situation was different because of how frequently the Penalty Factor was being triggered, combined with the Factor's inability to serve its intended function of encouraging short or long-term investment, or reductions in demand.

Finally, the Commission rejected the argument that suspension of the Penalty Factor in these circumstances was inconsistent with Order 844, which generally requires Regional Transmission Organizations to establish a Penalty Factor. The Commission reasoned that (1) PJM hewed to the Commission-approved method for changing Penalty Factors by providing fair notice, specificity, and transparency about when and how PJM would modify the Penalty Factor, and (2)

nothing in Order 844 barred PJM from making such a temporary modification.

**2**

Citadel petitioned for rehearing. While that petition was pending, PJM advised the Commission that, from February 15, 2022, to March 15, 2022, congestion patterns in the Northern Neck had remained significantly high. But since March 15th, there had not been additional congestion due in part to milder temperatures and lower demand. In addition, between March 28th and April 26th, Dominion had upgraded the Harmony Village Line's Greys Point and White Stone segments. To accommodate this, PJM had temporarily placed the Lanexa Line back into service while it updated the other two segments. There was no congestion while the Lanexa Line was back in service. Likewise, since the completion of the upgrades to the other two segments, congestion on the Northern Neck had decreased even after the Lanexa Line was taken back out of service. Though congestion had decreased, PJM maintained that the Penalty Factor should remain suspended because of concerns that congestion would recur during the high-demand summer and winter periods.

**3**

The Commission subsequently denied rehearing.

At the outset, the Commission addressed the upgrades to the Greys Point and White Stone segments of the Harmony Village Line. The Commission found as fact that, notwithstanding the upgrades, the Penalty Factor "could be triggered" in high-demand periods, and would continue to result in increased prices without any corresponding benefit.

*Order Addressing Arguments Raised on Rehearing*, 179 FERC ¶ 61161, at 8 (May 31, 2022) (J.A. 359) ("Rehearing Order").

The Commission then rejected Citadel's argument that this outage was like the others that had occurred in the Northern Neck in 2020 and 2021, during which the Penalty Factor was allowed to operate. The Commission explained that those prior outages were far less severe, and neither occurred in the middle of winter when solar resources are less effective. Plus, the prior outages were much more limited in duration (lasting only from one to six months), while the Lanexa Line upgrade was expected to take nearly two years. The Commission also noted that the prior outages were not the subject of Section 206 proceedings and there was no evidence that the Penalty Factor was ineffective at sending price signals during those more limited congestion periods.

Turning to Citadel's argument that the Penalty Factor was not linked to higher retail rates, the Commission explained that its Section 206 inquiry is concerned with wholesale rates and does not necessarily require retail-price harm to ratepayers. As for wholesale rates, the increase in prices at the Northern Neck increased the average price in a way that was unjust and unreasonable because the price increase could not elicit any commensurate short-term or long-term response, nor did it consistently provide consumers with all the electrical power they needed.

The Commission also found that suspension of the Penalty Factor is consistent with Order 844 because PJM provided adequate notice to market participants and satisfied the Order's transparency requirements.

Lastly, the Commission rejected Citadel's assertion that suspension of the Penalty Factor introduced regulatory

uncertainty. Citadel's argument, the Commission explained, incorrectly presumed that the Penalty Factor was working as intended. Because it was not functioning properly, the Commission's decision did not disrupt settled expectations.

### III

We have jurisdiction under the Federal Power Act, 16 U.S.C. § 825*l*(b), and we review Commission orders under the arbitrary and capricious standard. *West Deptford Energy, LLC v. FERC*, 766 F.3d 10, 17 (D.C. Cir. 2014). To that end, we must determine "whether the Commission's orders 'examined the relevant data and articulated a rational connection between the facts found and the choice made.'" *Id.* (quoting *Alcoa Inc. v. FERC*, 564 F.3d 1342, 1347 (D.C. Cir. 2009)). Our review is "highly deferential" in matters of ratemaking because issues regarding rate design are fairly technical and involve policy judgments. *Consolidated Edison Co. of New York, Inc. v. FERC*, 45 F.4th 265, 278 (D.C. Cir. 2022) (quoting *Alcoa Inc.*, 564 F.3d at 1347).

### IV

Citadel raises four challenges to the Commission's orders, arguing that the Commission (1) lacked substantial evidence that the Penalty Factor caused unjust and unreasonable rates, (2) lacked substantial evidence that the Penalty Factor failed to serve its intended purpose, (3) failed to provide a reasoned explanation for its departure from precedent, and (4) failed to

show that the replacement rate was just and reasonable. The record in this case forecloses each of those arguments.

**A**

Citadel's objection to the Commission's decision that the Penalty Factor caused unjust and unreasonable rates takes three forms, none of which withstands scrutiny.

**1**

Citadel first contends that Section 206 of the Federal Power Act requires the Commission to demonstrate both the existence and the magnitude of the Penalty Factor's effect on rates before determining that rates are unjust and unreasonable. That is incorrect.

The statutory text focuses not on computations, but on the bottom-line unjustness and unreasonableness of rates. 16 U.S.C. § 824e(a) ("Whenever the Commission, * * * shall find that any rate * * * demanded, observed, charged, or collected by any public utility * * * or that any rule, regulation, practice, or contract affecting such rate, * * * is unjust, unreasonable, unduly discriminatory or preferential, the Commission shall determine the just and reasonable rate * * * to be thereafter observed and in force, and shall fix the same by order."). For that reason, we have repeatedly allowed the Commission to find components of a wholesale rate to be unjust and unreasonable without calculating their dollars-and-cents impact on the final wholesale or retail rate. *See, e.g.*, *MISO Transmission Owners v. FERC*, 45 F.4th 248, 262 n.9 (D.C. Cir. 2022) ("Although the statute uses 'rate,' in this case the only component of the rate that was at issue was the Return, so that is what FERC focused on."); *Electricity Consumers Res.*

*Council v. FERC*, 747 F.2d 1511, 1513 (D.C. Cir. 1984) (focusing on individual components of the wholesale rate).

So too here. The Commission determined that one important component of the wholesale rate—the congestion cost—was unjust and unreasonable as applied in the distinct context of a temporary repair in an area where additional resources and demand reduction are geographically constrained. In doing so, the Commission considered evidence demonstrating that the Penalty Factor was setting congestion costs with abnormal frequency, demand was inelastic, and application of the Penalty Factor had not resulted in, and likely would not incentivize, the development of additional supply capable of resolving the problem going forward.

The evidence also revealed that, due to the inelasticity of demand and unavailability of new supply, application of the Penalty Factor was inflating prices while failing to provide a commensurate benefit by stimulating demand and supply responses when transmission constraints could not be resolved. *See San Diego Gas & Elec. Co. v. FERC*, 913 F.3d 127, 138 (D.C. Cir. 2019) (upholding Commission's decision to deny use of a rate incentive when application of the incentive would not serve its intended benefit); *NextEra Energy Res., LLC v. FERC*, 898 F.3d 14, 21 (D.C. Cir. 2018) ("We defer to the Commission's determination that the renewable exemption effectuates the market's primary purpose by sending the correct demand signals to new entrants and by protecting consumers from excessive rates.").

Said another way, the Commission concluded that increased prices on one side of the balance without any value on the other side of the scale—all pain and no gain—were unjust and unreasonable. That was "a principled and reasoned

decision supported by the evidentiary record[.]" *MISO Transmission Owners*, 45 F.4th at 258 (quoting *Emera Maine v. FERC*, 854 F.3d 9, 22 (D.C. Cir. 2022)).

And the Commission did not stop there. It causally connected the application of the Penalty Factor to increased wholesale rates. During periods of congestion, the Penalty Factor frequently set the congestion cost on the Northern Neck. That increase in the congestion cost necessarily increased overall prices because the congestion cost is one component of the wholesale rate, and the record showed no offsetting price reductions in the other components. *Order Finding Operating Agreement Unjust & Unreasonable & Establishing Replacement Rate*, 178 FERC ¶ 61104, at 27 (Feb. 18, 2022) (J.A. 311) ("Initial Order") (local marginal data showing price fluctuation due to the Penalty Factor "is sufficient to demonstrate the link between high prices and the Transmission Constraint Penalty Factor"); Rehearing Order, 179 FERC ¶ 61161, at 11 (J.A. 362) ("[A]n increase in real-time prices at the Northern Neck peninsula has the effect of increasing the real-time average zonal prices in a way that renders them unjust and unreasonable in these circumstances.").

Contrary to Citadel's argument, "[t]he Commission is not required to rely only on quantitative predictions" or measurements. *NextEra*, 898 F.3d at 24. In *NextEra*, the Commission approved an exemption to its minimum offer price rules, which set a floor for how much capacity a new resource must submit to an auction. *Id.* at 18. The generators argued that the Commission acted arbitrarily because it did not quantify the price suppression that would result from the exemption. *Id.* at 23. We rejected this argument and held that the Commission acted reasonably in finding the rate to be just and reasonable on the ground that any price suppression resulting from the Commission's approved rate would be

minimal, even though it had failed to quantify its precise impact on prices, *id.* at 23–24. The Commission permissibly relied on "substantial evidence to make a predictive judgment in an area in which it has expertise." *Id.* at 24.

Citadel points out that the congestion price at the Northern Neck is diluted because residents pay a "zonal rate" composed of an average of prices over many supply sources, of which the Northern Neck is just one. True, but Citadel overlooks how averages work. Where one component of an average drastically increases, the entire average will increase if all other factors remain constant. Given that Citadel did not identify any compensating offsets that would hold prices down, the spike in the congestion price would necessarily result in an increase in the average.

Beyond that, the fundamental problem identified by the Commission was that, in the Northern Neck's unusual circumstances, the Penalty Factor was all harm and no help to consumers, contrary to its intended purpose. In this way, the Commission found that the application of the Penalty Factor was unjust and unreasonable not just because of how much it increased the wholesale rate, but because it caused that increase for no justifiable purpose. That comfortably fits the definition of unjust and unreasonable.

For nearly 70 years, the Supreme Court and this court have consistently held that "the purpose of the power given the Commission by [Section] 206(a) is the protection of the public interest, as distinguished from the private interests of the utilities." *Metropolitan Edison Co. v. FERC*, 595 F.2d 851, 855 (D.C. Cir. 1979) (quoting *Federal Power Comm'n v. Sierra Pac. Power Co.*, 350 U.S. 348, 355 (1956)). Citadel does not, and cannot, argue that an increase in rates without any commensurate benefit is in the public's interest, let alone just

or reasonable. Even a penny increase would be unjust and unreasonable if it was imposed just because PJM felt like it.

Citadel also errs in arguing that *Public Citizen* requires the Commission to calculate the magnitude of a price increase before declaring it unjust and unreasonable. In *Public Citizen*, we found unjust and unreasonable auction rules that had anomalously produced capacity prices that were forty times higher than prices in neighboring regions. 7 F.4th at 1182. There, the Commission had acted unreasonably because it failed to "grappl[e] with the unusual magnitude of the rate increase and its incongruity with other rates within the same auction." *Id.* at 1199.

That made sense because the "extraordinary" nature of the price increase was the issue at hand in *Public Citizen*—the sole basis for the unjust-and-unreasonable determination. *Public Citizen*, 7 F.4th at 1200. If a challenger's central argument is that a rate is impermissible because of its magnitude, then the Commission must grapple with magnitude.

But that does not make the magnitude of a price increase a mandatory component of the Commission's assessment of every unjust-and-unreasonable challenge to rates. Rather, whether rates are unjust and unreasonable is a context-specific inquiry. *See Emera Maine*, 854 F.3d at 22. The court in *Public Citizen* acknowledged as much when it held that an extraordinary price increase under different circumstances may well be appropriate. *Public Citizen*, 7 F.4th at 1200 ("That is not to say that an extraordinary price spike necessarily evidences market manipulation or a malfunctioning auction process. The Commission could, on an appropriate record, reasonably conclude [otherwise.]"). Rate increases could be unjust because they are inexplicably large relative to their corresponding purpose. Or because they serve no purpose at

all. *See National Fuel Gas Supply Corp. v. FERC*, 900 F.2d 340, 342 (D.C. Cir. 1990) (under the National Gas Act, "the Commission is [not] bound to permit all relatively minor but nonetheless real [unjustified payments]"). No doubt rates could be struck down for other reasons too. *See, e.g.*, *Public Serv. Elec. & Gas Co. v. FERC*, 989 F.3d 10, 19 (D.C. Cir. 2021) (cost allocation method unjust and unreasonable because it fails to comport with cost-causation principles); *Verso Corp. v. FERC*, 898 F.3d 1, 5 (D.C. Cir. 2018) (rate methodology unjust and unreasonable because it did not follow cost-causation principles).

At bottom, the issue in this case is not the magnitude of a price increase, but rather the presence of an unjustified price increase that the Commission found was serving no good purpose. The lack of a reasoned justification for the price increase made it unjust and unreasonable in its own right.

**2**

Next, Citadel contends that the Commission could not have found the rates to be unjust and unreasonable without determining the Penalty Factor's impact on retail rates. Specifically, Citadel asserts that the Commission failed to cite evidence showing financial harm to retail consumers, and the evidence the Commission did cite—two charts that show congestion prices in the Northern Neck—are insufficient because they do not show the final retail prices.

By focusing only on end retail rates, Citadel's argument asks the wrong question. The Commission's obligation was to determine if the operation of the Penalty Factor at the Northern Neck was creating unjust and unreasonable rates. In this case, it did not need to compute the final dollar impact on retail rates to make a reasoned judgment that the Penalty Factor

was having an unjustifiable impact on energy prices. Unjustifiability can be more than a dollars-and-cents inquiry.

The charts on which the Commission relied constitute substantial evidence undergirding its determination. Here, each chart depicted the frequency with which the Penalty Factor (as opposed to available energy resources) set the congestion price during the Lanexa Line outage. Specifically, the charts illustrated that the congestion price continued to oscillate between nearly $0/MWh (when the marginal resource set the congestion cost) and $2000/MWh (when the Penalty Factor set the congestion cost).

More importantly, the charts revealed that the Penalty Factor set the congestion cost with striking frequency, during which times consumers paid high prices with no supply or demand response. Because the Penalty Factor's much-larger rate so frequently set congestion prices, yet still failed to induce production of the power supply that the Northern Neck needed or new investments that could address the problem, the Commission reasonably concluded it was not worth the candle. That determination is neither arbitrary nor capricious.

What is more, the charts illustrate the connection to retail rates that Citadel claims is missing. Because the congestion price is one of three components that make up the local marginal price, "it is undisputed" that the application of a $2000 Penalty Factor for congestion "on the Northern Neck peninsula significantly raises the Congestion Price and ultimately the [local marginal prices] that are realized by customers[.]" Letter from Chenchao Lu, Assistant Counsel & Craig Glazer, Vice President—Federal Government Policy, PJM Interconnection, L.L.C., to the Hon. Kimberly D. Bose, Secretary, Fed. Energy Regulatory Comm'n, at 2 n.2 (Feb. 15, 2022) (J.A. 281 n.2). When evaluating this evidence, the

Commission itself underscored the critical relationship between the Penalty Factor and the wholesale rate. And that wholesale price will inevitably be reflected in the retail rate. Initial Order, 178 FERC ¶ 61104, at 26 (J.A. 310) (application of the Penalty Factor will increase congestion costs and will "only result in higher costs to ratepayers"); Rehearing Order, 179 FERC ¶ 61161, at 11 n.57 (J.A. 362 n.57) ("In this case, the transmission Penalty Factor is increasing real-time prices in the area but is also increasing real time Dominion zonal prices because they are part of the average zonal price.") (quoting Market Monitor Comments at 1–2 (Feb. 2, 2022)).

The Commission's logical economic reasoning suffices to sustain its judgment. The Commission is entitled to rely on "basic economic theory, including relying on generic factual predictions, as long as the agency explains and applies the relevant economic principles in a reasonable manner." *Xcel Energy Servs. Inc. v. FERC*, 41 F.4th 548, 561 (D.C. Cir. 2022) (formatting modified) (internal quotation marks and citation omitted). The record here lacked any evidence of decreases in the other components of the wholesale rate that would have offset, or even reduced, the spike in the congestion cost. Given that, determining that a significant increase in one out of three components (congestion costs) of the final wholesale rate increases the wholesale rate is basic math. And a spike to $2000, when the regular congestion cost is typically $300, and can approach $0, would unquestionably increase the average.

The Commission's connection between wholesale rates and retail rates is equally elementary. When the Commission "takes virtually any action respecting wholesale transactions[,]" it "has some effect, in either the short or the long term, on retail rates." *Electric Power Supply Ass'n*, 577 U.S. at 281. After all, "[i]t is a fact of economic life that the wholesale and retail markets in electricity * * * are not

hermetically sealed from each other." *Id.* And transactions occurring "on the wholesale market have natural consequences at the retail level." *Id.*; *see American Paper Inst., Inc. v. American Elec. Power Serv. Corp.*, 461 U.S. 402, 417 n.11 (1983) ("In the context of rate-making, it is typically the case that any increment in the rate will 'make a small dent in the consumer's pocket[.]'") (quoting *Federal Power Comm'n v. Texaco Inc.*, 417 U.S. 380, 399 (1974)).

Citadel does not deny that. Instead, it argues that a prior PJM price analysis had shown that application of the Penalty Factor had only a "negligible" price impact. Citadel Opening Br. 46 (citation omitted). Specifically, PJM's tariff contained a price-impact analysis predicting that if the Penalty Factor set prices in 2017, the net load payments would have increased by $13.5 million, which PJM described as a "negligible" change. *See* Devendra Canchi & John Hyatt, MONITORING ANALYTICS, MARKET IMPLEMENTATION COMMITTEE—SPECIAL SESSION: IMPACT ON ENERGY MARKET IF TRANSMISSION PENALTY FACTORS SET PRICES, at 14 (June 27, 2018), https://perma.cc/Z3B7-AKXN (market monitor presentation stating that the Penalty Factor would increase payments by $13.5 million); Letter from Chenchao Lu, Assistant General Counsel, PJM Interconnection, L.L.C., to the Hon. Kimberly D. Bose, Secretary, FERC, at 5 n.12 (Nov. 9, 2018) (J.A. 23 n.12) (citing presentation and arguing "the price impact is negligible").

But Citadel's argument does not serve its cause. PJM's prediction about the application of the Penalty Factor in 2017 was based on historical data revealing that only eight percent of congestion constraints over the course of an entire year would not be resolved at a cost below the Penalty Factor. What happened at the Northern Neck, though, was that the Penalty Factor kicked in eight percent of the time over *all five-*

*minute intervals* when electricity prices were quoted for sale and delivery (congestion constraint or no congestion constraint) in fourteen days after the Lanexa Line went out of service. Put another way, the 2017 statistic on which the "negligible" comment relied is based on a prediction that the Penalty Factor would kick in for eight percent of *transmission constraints*, which themselves occur relatively infrequently. That was a far lower estimate than the eight percent of *all five-minute intervals* that occurred at the Northern Neck. This means that, in 2022, the Penalty Factor was applying at a frequency much greater than a historical frequency that would have resulted in $13.5 million in incremental annual net load payments—hardly chump change. In any event, the Commission may fairly conclude that a rate is unjust and unreasonable if applying it delivers no commensurate benefit to ratepayers—even if the rate increase might, in some absolute sense, be considered "negligible." *See* Section IV.A.1, *supra*. As we have explained, the Commission reasonably concluded as much here. *Id.*

For those reasons, substantial evidence sustains the Commission's finding that the Penalty Factor was having an adverse impact on electricity rates at the Northern Neck.

**3**

Citadel also argues that changed circumstances critically undermine the Commission's finding that the rates were unjust and unreasonable. Citadel points in particular to the "significant alleviat[ion]" of congestion following the upgrades to the Harmony Village Line's Greys Point and White Stone segments. Letter from Chenchao Lu, Assistant Counsel & Craig Glazer, Vice President—Federal Government Policy, PJM Interconnection, L.L.C., to the Hon. Kimberly D. Bose,

Secretary, Fed. Energy Regulatory Comm'n, at 4 (May 18, 2022) (J.A. 348).

Based on that evidence, Citadel argues that the problem of excessive and repetitive congestion had largely been remedied, so there no longer was any need to suspend the Penalty Factor. In Citadel's view, the Penalty Factor would now kick in "far less frequently than first assumed."  Citadel Opening Br. 54.

The Commission spoke directly to this argument.  It acknowledged the upgrades and the improved congestion conditions, but nonetheless found that congestion still could readily recur during the high-demand summer and winter months.  In other words, the segment upgrades left a material risk that the Penalty Factor would have the same unwanted effects over the coming months.

Contrary to Citadel's assertion, the Commission was not requiring that an upgrade ensure that congestion would never occur again.  Instead, the Commission was returning to the point it had made throughout both orders—that any solution must resolve the conflict between the purpose of the Penalty Factor, on one hand, and the realized adverse effects of the Penalty Factor in the Northern Neck's unique circumstances, on the other.   With the Penalty Factor already having produced consumer-harming unjust and unreasonable rates in the early months of the Lanexa Line upgrade, the Commission acted within its discretion by protecting against the predicted risk of harm recurring when demand increased in the summer and winter.  *See Wisconsin Pub. Power, Inc.*, 493 F.3d at 260–261 ("[I]t is within the scope of the agency's expertise to make * * * a prediction about the market it regulates, and a reasonable prediction deserves our deference notwithstanding that there might also be another reasonable view.") (quoting *Environmental Action, Inc. v. FERC*, 939 F.2d 1057, 1064

(D.C. Cir. 1991)); *see also MISO Transmission Customers*, 45 F.4th at 1017 (deferring to the Commission's reasonable predictive judgments). Given the Commission's risk prediction, nothing in the law or precedent required it to give the Penalty Factor a second chance at the expense of consumers.

In short, the Commission acknowledged and considered the impact of the changed circumstances on the application of the Penalty Factor and reasonably explained why they did not alter its judgment that the Penalty Factor had inflicted and would likely continue to inflict an unreasonable pricing harm without any corresponding benefit. Rehearing Order, 179 FERC ¶ 61161 (J.A. 359). For those reasons, Citadel's arbitrary and capricious claim fails. *See FCC v. Prometheus Radio Project*, 141 S. Ct. 1150, 1158 (2021) ("A court simply ensures that the agency has acted within a zone of reasonableness and, in particular, has reasonably considered the relevant issues and reasonably explained the decision.").

**B**

Citadel next takes on the evidence underlying the Commission's decision that the Penalty Factor was not serving its intended purpose. Here, Citadel argues that (1) the Commission lacked enough data points to determine that the Penalty Factor was acting contrary to its purpose, and (2) the Commission failed to consider evidence showing that the Penalty Factor actually did serve its purpose. Both objections come up short.

**1**

The Commission's judgment that the Penalty Factor would not serve its purpose in the unusual Northern Neck

circumstances rested in part on two charts that depicted price fluctuations over a fifteen-day period. Citadel asserts that fifteen days' worth of scarcity pricing data is factually insufficient to show that the Penalty Factor did not operate as intended. Not so.

As a preliminary matter, the charts revealed more information than Citadel credits. They documented drastic fluctuations in congestion pricing and the extraordinary frequency with which the Penalty Factor had been applied— setting the congestion cost 334 times in just two weeks.

Citadel's argument also overlooks that the Commission relied on more than just the charts to determine that the Penalty Factor was not serving its intended purpose. The Commission also considered evidence about supply and demand conditions at the Northern Neck to determine that application of the Penalty Factor would not result in either corrective investments or demand reduction. For example, the Commission had record evidence that, when the congestion began, there was no immediate demand response. Nor was a sufficient demand reduction feasible. And, in any event, any possible prospective demand response would be insufficient to offset the pricing distortions being caused by the Penalty Factor.

The evidence similarly revealed that supply responses could not reduce the high prices because the two turbine units on the Northern Neck available to supply power lacked sufficient capacity to make a dent in the unsatisfied demand. Also, PJM's Senior Vice President of Market Services testified that PJM was unaware of any available demand or supply responses to address the situation.

Evidence that current supply and demand responses were unavailable or insufficient and predictions about the lack of a

future response, coupled with charts depicting the real-world impact on the market, sufficed to support the Commission's judgment that, under the circumstances, the Penalty Factor was not serving and could not serve its intended purpose.

**2**

Next, Citadel argues that Dominion's acceleration of its already-planned upgrades to the Greys Point and White Stone segments proved that the Penalty Factor had worked as intended all along.

Citadel, however, failed to exhaust this argument. Our jurisdiction is strictly limited by the specific arguments a petitioner makes in its application for rehearing. *Indiana Util. Regul. Comm'n v. FERC*, 668 F.3d 735, 738–739 (D.C. Cir. 2012). The specificity requirement is not met if the petitioner merely refers to an argument generally, *Connecticut Dep't of Pub. Util. Control v. FERC,* 593 F.3d 30, 36 (D.C. Cir. 2010), or simply alludes to the argument in a single statement, *Indiana Util.*, 668 F.3d at 739. While an objection could be deemed specific if it was explicit and elicited a response from the Commission, neither of those happened here. *Cf. Allegheny Power v. FERC*, 437 F.3d 1215, 1220 (D.C. Cir. 2006) (petitioner did not object with the required specificity because the Commission did not respond to their "attempted incorporation by reference").

Citadel did not argue to the Commission that its decision was wrong because the Penalty Factor had worked exactly as designed when it prompted an acceleration of the segment upgrades. Though Citadel mentioned the upgrades in its rehearing petition, it argued only that the upgrades would resolve the congestion problem earlier than expected and would reduce the frequency with which the Penalty Factor was

triggered. Citadel's Reh'g Req. at 4–5 (J.A. 327–328). The argument pressed here—that the Penalty Factor worked as intended all along—is quite different.

The most to which Citadel can point is one sentence in its rehearing request about the Penalty Factor accelerating the Harmony Village Line segments' upgrades. Citadel's Reh'g Req. at 10 (J.A. 333). But even there, the point being made was that the Commission had departed from prior precedent, not that the Commission was factually wrong in concluding that the Penalty Factor was not working properly. Citadel's Reh'g Req. at 8–10 (J.A. 331–333).

Though the court can hear an argument not raised in a petitioner's application for rehearing if "there is a reasonable ground for [the petitioner's] failure" to raise the argument, 16 U.S.C.A. § 825*l*(b), that exception does not apply here. The "reasonable ground" exception is typically reserved for an "extraordinary situation, such as when a Commission practice is admitted or adjudged to be unlawful," *New England Power Generators Ass'n, Inc. v. FERC*, 879 F3d 1192, 1199 (D.C. Cir. 2018) (internal quotations omitted), or when new evidence first arises after the rehearing request, *see Wabash Valley Power Ass'n. Inc. v. FERC*, 268 F.3d 1105, 1114 (D.C. Cir. 2001) (considering a claim that was not raised below because it was based on a report issued several months after the rehearing request).

None of those circumstances are applicable in this case. Citadel knew when it filed its rehearing petition that Dominion was accelerating the upgrades in the wake of the congestion problem. Yet it still did not raise the argument that the Penalty Factor was working as planned in its request for rehearing. So we lack jurisdiction to consider Citadel's argument. *Consolidated Edison Co. of New York, Inc.*, 45 F.4th at 289

("Under 16 U.S.C. § 825*l*(b), '[n]o objection to [an] order of the Commission shall be considered by the court unless such objection shall have been urged before the Commission in the application for rehearing[.]'"); *United Power, Inc. v. FERC*, 49 F.4th 554, 559 (D.C. Cir. 2022) ("We therefore have no jurisdiction over an objection the petitioner fails to raise with specificity.").

The dissenting opinion agrees that Citadel did not raise this argument to the Commission. Dissent at 5 n.1. But it errs in arguing that Citadel had no opportunity to raise this issue in its request for rehearing. *Id.* By way of reminder, Citadel's argument is that Dominion's acceleration of the Harmony Village Line upgrades proved that the Penalty Factor worked as intended. *See*, *e.g.*, Citadel Opening Br. 58. Yet PJM notified all parties of the acceleration on February 10, 2022. PJM's Answer to Citadel's Protest, at 10–11, 24 (J.A. 253–254, 267). That was more than one month *before* Citadel filed its request for rehearing. Citadel's Reh'g Req., at 12 (J.A. 335) (request for rehearing filed on March 18, 2022). That gave Citadel the opportunity to raise its current argument in its application for rehearing. *See* 18 C.F.R. § 385.713(c)(3) (parties can raise arguments in a request for rehearing that were not raised in or addressed by the initial order "if rehearing is sought based on matters not available for consideration by the Commission at the time of the final decision or final order"). The proof is in the pudding: Citadel cited to PJM's factual update informing of the accelerated upgrades when raising a different argument in its request for rehearing. Citadel's Reh'g. Req. at 5 (J.A. 328) (citing PJM's Answer to Citadel's Protest, at 11–12 (J.A. 254–255)). Citadel likewise could have, and should have, cited to the factual update to allow the Commission to address in the first instance its argument that

the upgrades proved that the Penalty Factor worked as intended.

The dissenting opinion disputes none of that. Instead, it reasons that Citadel could not have objected either to the Commission's supposed failure to address new evidence or its alleged moving of the goalposts until the rehearing decision issued. But the Commission cannot be blamed for failing to address new evidence about whether the Penalty Factor worked when Citadel never made that argument, nor can the Commission move the goalposts on an issue never presented to or decided by it.

Had Citadel fairly teed up the issue for the Commission, it might have explained, as PJM suggests, that the Harmony Village Line upgrades were routine and already-planned reliability updates, and not the type of new investment that the Penalty Factor is meant to incentivize. PJM Br. 17–18. Or perhaps it would have had a different explanation. We cannot review what has not been decided because the argument Citadel presses here was not fairly posed to the Commission.

## C

Citadel's third challenge is that the Commission's orders departed from its own precedent in Order 844, which required Regional Transmission Organizations to include Penalty Factor rules and values in their tariffs, *see* Order 844, 163 FERC ¶ 61041. In that order, the Commission explained that the grid-wide use of Penalty Factors would produce more transparent pricing signals that would incentivize investment. *Id.* at 5, 21–22.

The Commission's temporary suspension of the Penalty Factor in the unusual circumstances presented in the Northern

Neck does not contravene Order 844. In obligating Regional Transmission Organizations to implement Penalty Factors, Order 844 also required them to prepare procedures for temporarily modifying their Penalty Factors. Order 844, 163 FERC ¶ 61041, at 85–86. Among other things, any modification must provide for notice to market participants of the modification "as soon as practicable." *Id.* at 85.

As the Commission explained, the orders on review built on Order 844's requirement to create modification procedures by introducing an additional, limited circumstance under which the Penalty Factor could be modified—when circumstances prevent the Factor from working as designed. Within weeks of the congestion, PJM notified the Commission of the issue and filed a proposed tariff that detailed the new procedures for modifying the application of the Penalty Factor. In doing so, PJM provided adequate notice and transparency regarding its temporary suspension of the Penalty Factor. And consistent with Order 844, the Commission approved a limited and targeted modification to address the circumstances at hand.

**D**

Citadel's final contention is that the Commission failed to show that its replacement rate was just and reasonable. The Commission replaced the Penalty Factor with the uncapped rates offered by resources available to help resolve the constraint. Citadel contends that, in finding the replacement rate just and reasonable, the Commission did not account for the regulatory uncertainty that its actions created. Citadel's argument is incorrect.

"[B]ecause 'the statutory requirement that rates be "just and reasonable" is obviously incapable of precise judicial definition, we afford great deference to the Commission in its

rate decisions.'" *Emera Maine*, 854 F.3d at 22 (formatting modified) (quoting *Morgan Stanley Cap. Group, Inc. v. Public Util. Dist. No. 1 of Snohomish County*, 554 U.S. 527, 532 (2008)). As a result, our review is "limited to ensuring that the Commission has made a principled and reasoned decision supported by the evidentiary record." *Id.* (quoting *Southern Cal. Edison Co. v. FERC*, 717 F.3d 177, 181 (D.C. Cir. 2013)). The Commission did so here.

The Commission explained that, while it seeks to increase regulatory certainty, circumstances may require it to adjust rates when they are operating contrary to investor expectations by producing anomalous results, contrary to their purpose and design. Here, the Penalty Factor was functioning in an unanticipated and counter-productive manner, and it had proven incapable of sending transparent signals to the market to encourage investment in new energy sources or transmission capability. Because the Penalty Factor was malfunctioning and causing prices to rise unjustifiably, suspending the Penalty Factor did not disrupt settled expectations. Rather, it was the application of the Penalty Factor that introduced uncertainty and confusion by sending incorrect price signals and inflicting significant financial harm for no good reason. The Commission appropriately responded in a calibrated manner to bring stability and reason to rates and adequate power supply to Northern Neck consumers.

Keep in mind also that the Federal Power Act on its face authorizes the Commission to step in and change rates whenever they become unjust or unreasonable. 16 U.S.C. § 824e(a) ("Whenever the Commission, after a hearing held upon its own motion * * * shall find that any rate * * * is unjust [or] unreasonable * * * the Commission shall determine the just and reasonable rate[.]"). All interested parties are charged with knowledge of that settled regulatory scheme, and so are

fully aware that tariff terms are not set in stone. That is the authority the Commission reasonably exercised here.

Citadel argues that if the Penalty Factor can be "suddenly and selectively" removed, market participants, especially suppliers (which Citadel is not), "will have little incentive to respond to * * * price signals." Citadel Opening Br. 62. That argument does not work here where the Commission found that suppliers were not able to respond to the price signals being sent by the Penalty Factor.

Citadel separately argues that the Commission's action will harm the Financial Transmission Rights market. Specifically, it argues that if Penalty Factors can be suspended, "financial firms will have little incentive to invest in such unpredictable markets." Citadel Opening Br. 63. But the temporary suspension of the Penalty Factor in one geographically unique area does not stop financial firms from benefiting from congestion pricing. Financial firms will still receive congestion costs, albeit less in one small part of the grid, during the temporary suspension of the Penalty Factor. Anyhow, nothing in the Federal Power Act or precedent compels the Commission to maintain an unjust and unreasonable rate simply because it increases the amount of money financial firms receive.

## V

For the foregoing reasons, Citadel's petitions for review are denied.

*So ordered.*

WALKER, *Circuit Judge*, dissenting:

Transmission grids take electricity from power plants to America's homes and businesses. Without transmission, the lights won't turn on. So when a transmission line goes down, the supply of electricity to consumers is limited and prices go up.

That is what happened here. PJM Interconnection manages a transmission grid in Virginia. A transmission line on PJM's grid went down for a two-year maintenance project, limiting the supply of electricity and raising prices.

To address that problem, PJM charged grid users a special rate called the Transmission Constraint Penalty Factor. The penalty factor boosts the price of electricity, thus incentivizing companies in the market to build more transmission capacity.

But shortly after the penalty factor started to apply, FERC suspended it. FERC held that the penalty factor was "not achieving its intended purpose" because it would "result in higher costs to ratepayers" without causing any "transmission investment." JA 309-310. Yet when FERC was later given evidence that the penalty factor *was* incentivizing transmission investment, FERC moved the goalposts. Instead of reasoning, as it had before, that the rate was providing no benefit, FERC instead said any benefit it provided wasn't big enough. *See* JA 359.

That unexplained shift in standards was arbitrary and capricious. So I would vacate FERC's order and remand.

2

I

A

Transmission-grid operators set out the terms for using the grid in a document called a tariff. Those terms — called rates — must be filed with FERC and approved as "just and reasonable." 16 U.S.C. § 824d(a). Tariffs thus contain transparent and consistent rules for determining which rates apply when power moves along the grid. 18 C.F.R. § 35.1(a)-(c).

But those rules aren't set in stone. FERC may modify rates if it determines that they are "unjust, unreasonable, unduly discriminatory or preferential." 16 U.S.C. § 824e(a). "The burden of demonstrating that the existing [rate] is unlawful is on FERC." *Emera Maine v. FERC*, 854 F.3d 9, 21 (D.C. Cir. 2017). And FERC must give "substantial evidence" supporting its decision to suspend a rate. *Id.* at 22.

B

In Eastern Virginia, a peninsula called the Northern Neck juts out into Chesapeake Bay. The Northern Neck's geography means that access to the rest of the state is limited. Just three transmission lines take power onto the peninsula.

In early 2022, a two-year maintenance project took one of those lines out of service. The reduced transmission capacity caused "congestion" in the Northern Neck's power supply. Resp. Br. 2. That is, the area's "transmission lines [were] not available to send lower-cost power to [a] location, resulting in the dispatch of more expensive power" — and raising electricity prices for consumers in the area. *Id.*

To combat congestion, the tariff governing the Northern Neck's grid provides for a special rate called the Transmission Constraint Penalty Factor. When it applies, the penalty factor artificially raises the cost of electricity above the market price, thus incentivizing companies to build more transmission capacity.

When the maintenance project got under way, congestion frequently triggered the penalty factor in parts of the Northern Neck. That caused the price of electricity to go up. But weeks later, the company managing the Northern Neck's grid — PJM Interconnection — asked FERC to suspend the penalty factor for the duration of the congestion-causing upgrades.

Despite opposition from Citadel and other market actors, FERC agreed to suspend the penalty factor using its authority to modify "unjust [and] unreasonable" rates. 16 U.S.C. § 824e(a). It concluded that the penalty factor was "not achieving its intended purpose" and was "establish[ing] high prices without a commensurate benefit." JA 309.

FERC explained that the penalty factor's "intended purpose" was to "incentivize supply and/or load response to help mitigate the constraint in the short-term, while also incentivizing the development of additional supply, load response and/or transmission through long-term investments." JA 309. In plain English: The penalty factor's goal is to spur market actors to use less electricity ("load response") or invest in solutions to the congestion ("additional supply" and "transmission").

But FERC reasoned that the penalty factor was unlikely to achieve that goal here because it would "not result in generation, demand response, or transmission investment to resolve the current situation or reduce the likelihood of future issues." JA 310. That's because there was "no known additional

supply" in the area and "demand response" was unlikely. *Id.* So the penalty factor would "only result in higher costs to ratepayers without a commensurate benefit." *Id.*

A month after FERC issued its decision, Citadel asked the agency to reconsider. Citadel argued that the penalty factor *had* led to investment in new transmission capacity. It pointed to an upgrade to another of the transmission lines into the Northern Neck — the Harmony Village Line. And it claimed that the penalty factor had "'accelerated'" work on that upgrade, JA 328, thus undermining FERC's conclusion that "continued application" of the penalty factor would "not result in . . . transmission investment," JA 310.

On rehearing, FERC refused to change its mind. But rather than defend its earlier claim that the rate would "not result in . . . transmission investment," it argued that the Harmony Village upgrade was not good enough. JA 310. It reasoned "the record does not indicate that the upgrade . . . will *completely resolve* the Constraint to prevent application of the . . . Penalty Factor." JA 359 (emphasis added).

Citadel petitioned this Court for review.

## II

Our review of FERC's ratemaking decisions is "highly deferential." *Consolidated Edison Company of New York, Inc. v. FERC*, 45 F.4th 265, 277 (D.C. Cir. 2022). But it's not a rubber stamp. FERC's orders must be reasonable and reasonably explained. *Id.*

That means that FERC cannot "ignore evidence contradicting its position." *Genuine Parts Co. v. EPA*, 890 F.3d 304, 312 (D.C. Cir. 2018) (cleaned up). And it may not "depart

5

from" a previous ruling "without providing a reasoned analysis indicating that prior policies and standards are being deliberately changed." *Public Service Electric & Gas Co. v. FERC*, 989 F.3d 10, 17 (D.C. Cir. 2021) (cleaned up).

In response to Citadel's rehearing petition, FERC broke both those rules.[1]

A

To start, FERC ignored evidence suggesting that the penalty factor accelerated upgrades to the Harmony Village Line, helping to mitigate congestion in the Northern Neck.

In its original order, FERC said the penalty factor would not serve its intended purpose because there was no evidence that it would "help mitigate the constraint" on the transmission grid by incentivizing investment. JA 309-10.

---

[1] Citadel raised this argument at its first opportunity — in its first brief before this Court. *See* Pet. Br. 57-59. Citadel could not have pointed out an error in the rehearing order in its petition for rehearing because FERC made the alleged error in the rehearing order. We thus have jurisdiction over Citadel's argument. *See Columbia Gas Transmission Corp. v. FERC*, 477 F.3d 739, 741-42 (D.C. Cir. 2007).

The majority may be correct that we do not have jurisdiction over Citadel's broad argument "that Dominion's acceleration of the Harmony Village Line upgrades proved that the Penalty Factor worked as intended." Majority Op. 34; *see also* Pet. Br. 58. But we have jurisdiction over its narrower legal argument that FERC failed to adequately address new evidence and "moved the goalposts" in its rehearing order. Pet. Br. 57-58. Citadel could not have known that FERC's rehearing order would suffer from those defects until after the rehearing order was issued.

But on rehearing, new evidence undermined that conclusion. Citadel asserted that the penalty factor had "accelerated a transmission upgrade" on the Harmony Village Line that was "designed to significantly alleviate the transmission constraint." JA 328 (cleaned up). That upgrade, Citadel argued, would "significantly diminish the need to apply the [penalty rate]" going forward, by "resolv[ing] the constraint [on the grid] 19 months earlier than . . . initially predicted." *Id.* (cleaned up).

Tellingly, earlier in FERC proceedings, PJM acknowledged that the Harmony Village Line was "expected to significantly alleviate the transmission constraint" in the Northern Neck. JA 254. Yet FERC dismissed the potential upgrade in its initial order because it was "unclear whether [it would] actually be constructed and put in service." JA 311.

On rehearing, FERC recognized that the upgrade had "been placed into service." JA 359. But it failed to explain why the upgrade did not show that the penalty factor was incentivizing transmission investment that would help mitigate congestion.

To be clear, I take no position on whether the Harmony Village upgrade is sufficient evidence to *compel* FERC to keep the penalty factor. It is the agency's job to weigh evidence, not ours. *Calcutt v. Federal Deposit Insurance Corp.*, 143 S. Ct. 1317, 1320-21 (2023). But FERC's failure to address "evidence contradicting its position" was arbitrary and capricious. *Genuine Parts Co*, 890 F.3d at 312 (cleaned up).

## B

Rather than explain why it discounted the Harmony Village upgrade, FERC moved the goalposts, changing the test for whether the penalty factor was serving its purpose.

Begin with FERC's test in its original order. It said the purpose of the penalty factor is to spur transmission investment that could help mitigate congestion. For example:

- FERC adopted the testimony of an expert witness who stated that "the underlying goal and intent of [the penalty factor] is to provide market signals that incentivize supply and/or load response *to help mitigate the constraint* in the short-term, while also incentivizing . . . long-term investments." JA 309 (cleaned up).

- FERC recognized that it was possible that "resources" might enter the market to "*help relieve* the Constraint," but concluded that it was unlikely. JA 310 (emphasis added).

Now consider the test in FERC's rehearing order. It said the Harmony Village upgrade evidence was inadequate because it "does not indicate that the upgrade . . . will *completely resolve* the Constraint to prevent application of the . . . Transmission Constraint Penalty Factor." JA 359 (emphasis added).

That is a new test. Before, FERC said the penalty factor's purpose was to "mitigate" or "help relieve" congestion. JA 310. On rehearing, when confronted with evidence that the penalty factor was doing just that, FERC said the rate's purpose was to *completely resolve* congestion. *See* JA 359.

Yet FERC did not address — let alone explain — its decision to change the test. Indeed, FERC showed no awareness that it *was* changing the test. On rehearing, it said the Harmony

Village upgrade did not address "the flaws" with applying the penalty factor that FERC had identified in its initial order.  JA 359.

FERC cannot explain away contradictory evidence on rehearing by moving the goalposts — and pretending that no one will notice.  It must either explain why the new evidence does change its conclusion under the original standard or, alternatively, explain why it changed that standard.  Its failure to do so falls far short of the "reasoned analysis" an agency must provide to show a standard is being "deliberately changed." *Public Service Electric & Gas Co. v. FERC*, 989 F.3d at 17 (cleaned up); *see also Alcoa Inc. v. FERC*, 564 F.3d 1342, 1347 (D.C. Cir. 2009) (agency may not "casually ignore[]" "prior policies and standards").

\* \* \*

Because FERC's reasoning in its response to Citadel's rehearing petition was arbitrary and capricious, I would vacate FERC's order and remand to the agency.